UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :

UNITED STATES OF AMERICA,                              :

    - v. -                                          :        S7 10 Cr. 228 (LTS)

PETER MADOFF,                                          :

             Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## **GOVERNMENT'S SENTENCING MEMORANDUM**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York


LISA A. BARONI
JULIAN J. MOORE
MATTHEW L. SCHWARTZ
Assistant United States Attorneys

    - Of Counsel -

## <u>TABLE OF CONTENTS</u>

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Madoff's Scheme to Create False and Misleading BLMIS Documents . . . . . . . . . . . . . . . . . . . 2

Madoff's Scheme to Make False Filings with the SEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Madoff Enriched Himself and His Family Through a Massive Tax Fraud Scheme and
    A No-Show Job For His Wife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Madoff's Conduct at the Collapse of BLMIS in 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Madoff's Guilty Plea and Plea Agreement with the Government . . . . . . . . . . . . . . . . . . . . . . 8

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A.  Application of Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    1.   Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    2.   More Than 250 Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    3.   Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    4.   Endangering Solvency or Financial Security of Victims . . . . . . . . . . . . . . . . . . . . . 12

    5.   Registered Broker-Dealer/Investment Adviser . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B.  Sentencing Factors Under Title 18, United States Code, Section 3553 . . . . . . . . . . . . . . . 13

    1.   The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    2.   History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    3.   The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    4.   The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . . . . 18

    5.   The Need To Provide Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

UNITED STATES OF AMERICA,                     :

        - v. -                                :        S7 10 Cr. 228 (LTS)

PETER MADOFF,                                 :

              Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the

sentencing of defendant Peter Madoff, scheduled for December 20, 2012, at 4:30 p.m.

### RELEVANT FACTS

The defendant Peter Madoff ("Madoff"), an attorney who was the Chief Compliance

Officer and Senior Managing Director of Bernard  L. Madoff Investment Securities ("BLMIS"),

committed very serious crimes that served to conceal and perpetuate a multi-billion dollar fraud

scheme that victimized thousands of BLMIS investors.   In addition, Madoff engaged in a vast

tax fraud scheme by which tens of millions of dollars were transferred within the Madoff family

in ways that avoided paying millions of dollars of required taxes to the Internal Revenue Service,

all to enrich himself and his family members.

On June 29, 2012, Madoff pleaded guilty before this Court to a Criminal Information

charging him with conspiracy to (1) commit securities fraud; (2) falsify records of an investment

adviser; (3) falsify records of a broker-dealer ; (4) make false filings with the SEC; (5) commit

mail fraud; (6) falsify statements in relation to documents required by ERISA; and (7) obstruct

and impede the lawful governmental function of the IRS, as well as a substantive count of

falsifying records of an investment adviser.  (*See* Information S7 10 Cr. 228 (LTS) ("Inf."), *see also* Presentence Investigation Report, dated December 10, 2012, ("PSR") ¶¶ 1-5).

The Government seeks a sentence of 10 years' imprisonment in this case.  The Probation Office recommends a sentence of 10 years' imprisonment.  (PSR pp. 43, 45).  And pursuant to a plea agreement dated June 29, 2012, Madoff agreed to a Stipulated Guidelines Sentence of 10 years' imprisonment ("Stipulated Guidelines Sentence").  Under the terms of the plea agreement, Madoff agreed "not to seek a sentence other than the Stipulated Guidelines Sentence of 10 years' imprisonment, suggest that the Probation Office consider a sentence other than the Stipulated Guidelines Sentence, or suggest that the Court *sua sponte* consider a sentence other than the Stipulated Guidelines Sentence."  (*See* Plea Agreement, dated June 29, 2012 ("Plea Agmt."), at p. 5; PSR ¶ 6(m)).  Madoff further agreed not to "seek any departure or adjustment pursuant to the Guidelines" and not to "suggest that the Probation Office consider such a departure or adjustment" or "suggest that the Court *sua sponte* consider any such departure or adjustment" from the Stipulated Guidelines Sentence of 10 years.  (Plea Agmt. at p. 4; PSR ¶ 6(m)).  Accordingly, the Government submits that a sentence of 10 years is reasonable and appropriate in this case.

A.      **Madoff's Scheme to Create False and Misleading BLMIS Documents**

As set forth in the Information to which he pleaded guilty and the Presentence Investigation Report, in his capacity as the Chief Compliance Officer ("CCO"), Madoff engaged in a scheme to create false and misleading entries in BLMIS documents that were designed to make it appear that Madoff had performed compliance reviews of BLMIS's Investment Advisory ("IA") business and that BLMIS actually had an effective compliance program in place.  In

reality, Madoff did nothing of the sort and BLMIS had no effective compliance program in place. The defendant's false statements related to the completely fraudulent IA business through which the fraud scheme was run.  Had Madoff actually conducted the compliance reviews he purported to have performed, the reviews would have confirmed that no real securities trading was occurring in the IA business.  (Inf. ¶¶ 18-22; PSR ¶ 35).

For example, the BLMIS Compliance Manual, which Madoff participated in writing, required Madoff to perform regular reviews of the trading activity in the BLMIS IA business and to prepare reports reflecting those reviews (the "Investment Advisory Reviews" or "Reviews"). In fact, Madoff did not perform any Investment Advisory Reviews of the trading activity as he was required.  Further, in order to make it appear that he had performed them, Madoff signed several weeks of fictitious Reviews in one sitting, intentionally changing pens and ink colors to conceal that he had created the Reviews all at one time.  (Inf. ¶ 19; PSR ¶ 35).

After BLMIS registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser in 2006, BLMIS was required under the Investment Advisers Act to perform certain additional annual compliance reviews of its Investment Advisory operations.  In 2007 and 2008, Madoff created and approved false annual reports under Rule 206(4)-7 of the Investment Advisers Act, in which he stated that he had performed the required annual compliance reviews of BLMIS's IA business; however, Madoff did not perform *any* of the required reviews.  For example, on one occasion, Madoff certified that he had "qualitatively tested the compliance procedures" and that "[i]t was demonstrated to the CCO [Madoff] that the reviews [of BLMIS's IA trading] are reasonably designed to detect violations of the Investment Adviser Rules and the federal securities laws applicable to [BLMIS's] business."  As Madoff

3

knew, these statements were false and created the false impression to regulators, auditors, and IA clients that Madoff had undertaken substantive compliance reviews, when in fact he had not. He also certified that he had "examined the process by which all trading is supervised" in the BLMIS IA business, and that he had "found that the implementation of the compliance procedures reflected good principles of management and control."  All of these statements were false.  Madoff performed no such reviews and conducted no examinations of trading in the IA business.  Had he done so, it would have confirmed that no trades actually were being conducted in the IA business and that the entire IA operation was a fraud.  Not only did Madoff know that these statements were false, but he also knew that they created the false impression to regulators and IA clients that BLMIS had undertaken substantive compliance reviews which were never actually performed.  (Inf. ¶¶ 20-21; PSR ¶¶ 36-37).  The defendant's false statements, and his complete failure to fulfill his duties as the Chief Compliance Officer of the firm, served to perpetuate the multi-billion dollar fraud in which thousands of investors were defrauded.  If regulators and IA clients who were deceived by the defendant had known the truth about the defendant's sham compliance program, it is possible that the fraud would have been detected years earlier and losses to the many victims could have been avoided.

        **B.**      **Madoff's Scheme to Make False Filings with the SEC**

        After BLMIS registered as an Investment Advisor with the SEC in 2006, BLMIS was required under the Investment Advisers Act to file Forms ADV at least on an annual basis.  The information provided on the Form ADV is used by the SEC, among other things, to manage its examination programs of investment advisers.  (Inf. ¶ 24; PSR ¶ 39).

        Madoff created false and misleading Forms ADV and caused them to be filed with the

4

SEC.  The Forms ADV contained numerous false statements about the nature of BLMIS's

Investment Advisory operations, including that: (1) BLMIS provided Investment Advisory

services to only approximately "11 to 25" clients; (2) the "total number" of IA accounts was

"23"; (3) BLMIS had assets under management of approximately $11.7 billion in 2006, $13.2

billion in 2007, and $17.1 billion in 2008; (4) BLMIS's IA services were available "only to

institutional and high net worth clients;" (5) Madoff, as CCO, ensured that reviews of IA trading

were being performed; and (6) no other firms or individuals solicited IA clients on behalf of

BLMIS.  (Inf. ¶ 26; PSR ¶ 40).

As Madoff knew, all of these statements were false.  BLMIS had significantly more than

23 accounts – in fact, in 2008, it had more than 4,000 IA accounts and, on paper, had

approximately $65 billion in assets under management.  Madoff also knew that BLMIS's IA

services were not available only to "institutional and high net worth clients"; rather, many

BLMIS IA clients were ordinary investors who did not have a high net worth.  Madoff also knew

that many individuals and entities solicited IA clients in exchange for fees from BLMIS; in fact,

Madoff even had an ownership interest in one such firm, Cohmad Securities, and he also

personally solicited IA clients on behalf of BLMIS.  Finally, with respect to the false statements

that Madoff, as CCO of BLMIS, ensured that reviews of IA trading were being performed,

Madoff knew this statement was false as he never performed any such reviews.  (Inf. ¶¶ 27-30;

PSR ¶ 41).

Madoff's numerous false statements in the many Forms ADV filed with the SEC between

2006 and 2008 were designed to create the false appearance that BLMIS's IA business had a

small number of highly sophisticated clients and fewer assets under management in order to

avoid greater scrutiny from the SEC.  The false statements were designed to mislead the SEC, as well as IA clients and auditors.  Madoff's deception on the Forms ADV served to perpetuate the fraud that resulted in billions of dollars of actual loss to BLMIS's clients.  (Inf. ¶ 31; PSR ¶ 42).

### C.   Madoff Enriched Himself and His Family Through a Massive Tax Fraud Scheme and a No-Show Job For His Wife

In addition to these crimes, Madoff also engaged in a massive tax fraud scheme designed to enrich himself and other members of his family.   Madoff and others transferred millions of dollars within the Madoff family in ways that were designed to avoid required tax payments to the IRS.  (Inf. ¶¶ 37-52; PSR ¶ 45).

The methods by which Madoff engaged in tax fraud included the following: (1) Madoff received approximately $15,700,000 from Bernard L. Madoff and his wife, and Madoff executed sham promissory notes to make it appear that the transfers of these funds were loans in order to avoid required tax payments (Inf. ¶¶ 37-38; PSR ¶ 46); (2) Madoff gave approximately $9,900,000 to other Madoff family members, and Madoff executed sham promissory notes to make it appear that the transfers of these funds were loans in order to avoid required tax payments (Inf. ¶ 39; PSR ¶¶ 47, 54); (3) Madoff received approximately $7,750,000 directly out of the BLMIS bank account that held investors' money (the "IA Bank Account") and did not pay taxes on these funds (Inf. ¶¶ 40-42; PSR ¶ 48); (4) Madoff received approximately $16,800,000 from Bernard L. Madoff from two sham stock trades, and disguised the proceeds of the trades as long-term stock transactions in order for Madoff to take advantage of the lower tax rate for long-term capital gains (Inf. ¶¶ 44-49; PSR ¶¶ 49-51); and (5) Madoff charged approximately $175,000 in personal expenses to a corporate American Express card and did not report those expenses as income (Inf. ¶¶ 50-52; PSR ¶ 52).  From these tax avoidance schemes, Madoff

6

avoided paying millions of dollars in taxes that he was required to pay to the IRS and other

taxing authorities.  Further, Madoff's conspiracy with Bernard L. Madoff caused Bernard L.

Madoff to avoid paying millions of dollars in additional taxes that he was required to pay to the

IRS.  In all, Madoff's actions avoided the payment of required taxes on more than $50 million in

funds transferred within the Madoff family.

      If enrichment in the form of tens of millions of dollars through a massive tax fraud

scheme were not enough, in 1996 Madoff instructed another BLMIS employee to put his wife on

the BLMIS payroll.  Madoff's wife did not work at BLMIS; nonetheless she received

approximately $100,000 to $160,000 a year in purported salary for many years, as well as other

benefits, to which she was not entitled.  Madoff also caused false documents to be submitted to

various third parties falsely stating that his wife was eligible to participate in the 401(k) plan and

other benefit programs.  (Inf. ¶¶ 53-55; PSR ¶ 53).

### D.    Madoff's Conduct at the Collapse of BLMIS in 2008

      By the fall of 2008, the collapse of BLMIS appeared likely to certain BLMIS employees.

From at least in or about the fall of 2008, requests for redemptions made by BLMIS IA clients

began to increase at a rate greater than investments made by new or existing clients.  For

example, on or about November 3, 2008, the balance of the IA Bank Account was approximately

$487 million, and unfulfilled requests for redemptions totaled approximately $1.447 billion.  By

on or about December 4, 2008, the balance of the IA Bank Account was only approximately

$295 million, and unfulfilled requests for redemptions from IA clients totaled approximately

$1.455 billion.  In December 2008, certain BLMIS employees prepared lists reflecting preferred

employees, family members, and certain other IA clients, and the balances in their respective IA

accounts.  Madoff and others reviewed these lists and decided which preferred IA clients –

including Madoff's own friends and family – should receive the remaining BLMIS funds, putting

the interests of themselves, their friends, and their families ahead of all of the other IA clients.

(Inf. ¶¶ 32-35; PSR ¶ 44).

The defendant, and others, then caused checks to be prepared for these preferred IA

clients so that the remaining BLMIS funds would be sent to them before BLMIS collapsed.

More than approximately $300 million in checks were prepared to be mailed to these preferred

IA clients.  However, BLMIS collapsed before these checked were ever mailed.  (Inf. ¶ 35; PSR ¶

44).

In addition, on or about December 10, 2008, after he knew for certain from his brother

Bernard L. Madoff that the collapse of BLMIS was imminent, Madoff withdrew approximately

$200,000 from a BLMIS bank account for himself.    (Inf. ¶¶ 36, 43; PSR ¶ 44).

As of on or about November 30, 2008, BLMIS had approximately 4,900 client accounts.

(*See* PSR ¶ 18).  On or about December 1, 2008, BLMIS issued account statements for the

calendar month of November 2008 falsely reporting that those client accounts held a total

balance of approximately $64.8 billion.  (*Id.*).  The net loss to BLMIS investors is approximately

$19.9 billion.  (*See* PSR ¶ 73 n.5).

E.    **Madoff's Guilty Plea and Plea Agreement with the Government**

On June 29, 2012, Madoff pleaded guilty before this Court to a two-count Criminal

Information charging him with conspiracy to (1) commit securities fraud; (2) falsify records of an

investment adviser; (3) falsify records of a broker-dealer ; (4) make false filings with the SEC;

(5) commit mail fraud; (6) falsify statements in relation to documents required by ERISA; and

(7) obstruct and impede the lawful governmental function of the IRS, as well as a substantive count of falsifying records of an investment adviser.  (*See* Information S7 10 Cr. 228 (LTS); PSR ¶¶ 1-5).

As discussed more fully above, pursuant to a plea agreement with the Government dated June 29, 2012, Madoff agreed to a Stipulated Guidelines Sentence of 10 years' imprisonment. Under the terms of the plea agreement, Madoff agreed "not to seek a sentence other than the Stipulated Guidelines Sentence of 10 years' imprisonment, suggest that the Probation Office consider a sentence other than the Stipulated Guidelines Sentence, or suggest that the Court *sua sponte* consider a sentence other than the Stipulated Guidelines Sentence."  (*See* Plea Agmt. at pp. 4-5; PSR ¶ 6(m)).

## DISCUSSION

### A.      Application of Sentencing Guidelines

Under the applicable Sentencing Guidelines, Madoff is in Criminal History Category I, and has an adjusted offense level of 49.  (PSR ¶¶ 95, 99).  The Guidelines therefore call for a sentence of life imprisonment.  However, the Guidelines range exceeds the statutory maximum term of imprisonment of 10 years.  Therefore, the Guidelines sentence is computed by adding the applicable statutory maximum sentences on all counts of conviction, which results in a Guidelines sentence of 10 years' imprisonment.  *See* U.S.S.G. § 5G1.2(d).  (PSR ¶ 159).

Although no longer binding upon the Court, the Guidelines represent the considered judgment of the U.S. Sentencing Commission, a body of experts, drawn from all areas of the legal profession, specifically created to determine the appropriate sentence in particular types of cases.  As the Honorable Gerard E. Lynch has recognized, it is important for "rational judges

[to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004). Judge Lynch further noted the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record." *Emmenegger*, 329 F. Supp. 2d at 426.

The Stipulated Guidelines Sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Madoff's conduct. Because each of the offenses of conviction is fraud-related and grouped, Section 2B1.1 determines the applicable offense level. Under Section 2B1.1, and including applicable Chapter Three adjustments, the defendant's offense level is 49, calculated as follows: a base offense level of 6 (§ 2B1.1(a)(2)); increased by 30 levels for a loss of more than $400 million (§ 2B1.1(b)(1)(P)); increased by 6 levels because the offenses involved more than 250 victims (§ 2B1.1(b)(2)(C); increased by 2 levels because the offenses involved sophisticated means (§ 2B1.1(b)(10)); increased by 4 levels because the offenses substantially endangered the solvency or financial security of 100 or more victims (§ 2B1.1(b)(15)(B)); increased by 4 levels because the defendant was associated with a registered investment adviser or broker-dealer (§ 2B1.1(b)(18)(A)); and reduced by 3 levels for acceptance of responsibility for his role in the offense (§ 3E1.1). (PSR ¶¶ 80-92).

In the plea agreement with the Government, Madoff agreed to the Guideline calculations set forth above; however, the Government briefly reviews below the bases for these calculations.

1.       **Loss**

In determining the amount of loss resulting from a fraud offense, the sentencing court is

not required to compute the loss "'with precision.'"  *United States* v. *Jacobs*, 117 F.3d 82, 95 (2d

Cir. 1997) (quoting U.S.S.G. § 2F1.1, comment. (n.9) (1987)).  Instead, the applicable Guidelines

provide that:

> The court need only make a reasonable estimate of the loss.  The
> sentencing judge is in a unique position to assess the evidence and
> estimate the loss based upon that evidence.  For this reason, the
> court's loss determination is entitled to appropriate deference.

U.S.S.G. § 2B1.1, comment. (n.3(C)); *see also United States* v. *Bennett*, 252 F.3d 559, 565 (2d

Cir. 2001) (court need only make reasonable estimate of loss).  As the Sentencing Commission

explained, following the passage of the Sarbanes-Oxley Act of 2002, Pub. Law 107-204, the loss

table was increased, as well as other enhancements added, to "punish adequately offenses that

cause catastrophic losses of magnitudes previously unforseen" and "address congressional

concern regarding particularly extensive and serious [corporate] fraud offenses."  U.S.S.G. App.

C, amend. 647.

Madoff is responsible, under the Sentencing Guidelines, for a loss of approximately $19.9

billion – the actual loss to BLMIS investors from the conspiracy – far in excess of the maximum

loss threshold of $400 million in the Section 2B1.1(b).  (*See* PSR ¶¶ 73 n5, 83).

2.       **More than 250 Victims**

Pursuant to Section 2B1.1(b)(2)(C), the defendant's offense level should be enhanced six

levels because the offense involved more than 250 victims.  (*See* PSR ¶ 84).  Here, Madoff's

offenses involved more than 4,000 IA account holders and many of those account holders were

feeder funds or pension funds that had many additional indirect BLMIS investors.  (*See* PSR ¶

11

18).

### 3.   Sophisticated Means

Pursuant to Section 2B1.1(b)(10), the defendant's offense level should be enhanced two

levels because the offense involved sophisticated means, including creating fake compliance

reports, Forms ADV and other regulatory documents, as well as orchestrating a tax fraud scheme,

through multiple sham promissory notes and other means, that avoided the payment of millions

of dollars of required taxes over the course of years.  (*See* PSR ¶ 85).

### 4.   Endangering the Solvency or Financial Security of Victims

Section 2B1.1(b)(15)(B) provides for a four-level increase if an offense "substantially

endangered the solvency or financial security of 100 or more individuals."  This enhancement

reflected the Commission's conclusion "that the specificity of Section 805(a)(4) [of Sarbanes-

Oxley] required an enhancement focused specifically on conduct that endangers the financial

security of individual victims.  Thus, use of this prong of the enhancement is appropriate in cases

in which there is sufficient evidence for the court to determine that the amount of loss suffered by

individual victims of the offense substantially endangered the solvency or financial security of

those victims."  U.S.S.G., App. C, amend. 647.

As noted in the PSR, more than 800 investor accounts suffered losses of more than $1

million.  (*See* PSR ¶ 86).  Thus, this enhancement plainly applies.

### 5.   Registered Broker-Dealer/Investment Adviser

Section 2B1.1(b)(18)(A) provides that if an offense involved a violation of the securities

laws and the defendant was, at the time of the offense, a registered broker or dealer, or a person

associated with a broker or dealer, or was an investment adviser or a person associated with an

investment adviser, the offense level should be enhanced four levels.

This enhancement applies in light of Madoff's position as Chief Compliance Officer and Senior Managing Director of BLMIS, which was a registered broker-dealer at all times pertinent to the offenses, and beginning in 2006, was a registered investment adviser.  (*See* PSR ¶ 87).  In fact, the defendant created and caused numerous false IA registration documents to be filed with the SEC.

**B.**     **Sentencing Factors Under Title 18, United States Code, Section 3553**

　　　　**1.**     **The Nature and Circumstances of the Offense**s

Madoff's very serious crimes had the effect of concealing and perpetuating a multi-billion dollar fraud scheme that victimized thousands of BLMIS investors, a fraud in which investors suffered an actual loss of approximately $19.9 billion.

For many reasons, Madoff's crimes call for severe punishment.  First, his crimes involved ongoing and systematic deception; for years, Madoff repeatedly lied to regulators, investors and auditors.   He intentionally failed to perform his duties as the Chief Compliance Officer.  His crimes included lying to the SEC in regulatory filings about the number of IA clients, the amount of investor funds under management in the IA business, and the extent of his compliance duties.  Madoff also pretended to do compliance reviews of the trades in the IA business, when in fact he did no such reviews.  He created completely false reports claiming he had performed regular reviews of the IA trading, instead of actually performing them.  Further, he covered up the falsity of those reviews.  In fact, Madoff signed several weeks of fictitious trading reviews in one sitting, changing pens and ink colors to conceal that the reports actually had been created at one time.  Regulators, investors and auditors relied on the false statements made by Madoff in his

false compliance reports and SEC filings.  Had Madoff actually performed the duties he was supposed to perform, he would have confirmed that no trading was ever performed in the IA business.

Second, his crimes harmed numerous individuals, non-profit organizations, financial institutions and educational institutions.  As a result of his conduct that perpetuated the fraud, many individuals and institutions suffered economic ruin.

Third, Madoff's crimes were not born of economic necessity.  At no point was his criminal conduct the result of any financial duress.  To the contrary, Madoff was an attorney and a licenced equity trader and registered options principal, (PSR ¶¶ 143-44), and therefore had legitimate means to support himself.  His crimes were not a one-time event arising from financial pressures.  Rather, they were calculated and well thought-out over the course of years.  At all times, it was within the defendant's power to stop his crimes.  In fact, the enormous tax fraud scheme involving approximately $50 million served to enrich himself and his family and was ongoing for at least ten years.

Finally, Madoff's crimes wrought economic devastation to the lives of scores of victim investors.  As a result of his lies and overall pattern of deception, approximately $143.1 billion of funds flowed into the IA Bank Account that held investors' funds during the time of this defendant's fraud.  Further, the account statements provided to IA clients represented that IA clients had assets with BLMIS worth approximately $65 billion as of November 30, 2008.  The net loss suffered by IA clients totals approximately $19.9 billion.  (*See* ¶¶ PSR 18, 73 n.5, 83).

The defendant does not contest the forfeiture or the loss amounts.[1]  References to these enormous losses from the fraud does not capture the full harm to the victims.  By way of illustration, the Government refers the Court to the many victim impact statements submitted in *United States* v. *Bernard L. Madoff*, 09 Cr. 213 (DC), (*see* Dkt. Entries 79, 81).  As they demonstrate, the conspiracy perpetrated through BLMIS by Peter Madoff and others wiped out the resources of many families – resources that, in some instances, represented generations of hard work and savings.

In this case, the Government has received victim impact statements and a request from at least one victim to speak at the sentencing hearing.[2]  Some of the submissions are excerpted below:

> \*   Peter [Madoff] could have come forward and stopped this crime much earlier thereby greatly limiting the financial damage done to "his customers."  He chose not to! The entire investment advisory team waited - until the scheme collapsed. Then they played the part of three blind mice - hear no evil, see no evil and do no evil.  (Michael and Emma De Vita)

> \*   My husband, Elie Wiesel, and I were victimized by the Madoff fraud in both the personal and business realms of our lives.  Personally, the impact of this crime affected almost all of our assets and resulted in the immediate and dramatic loss of a lifetime's worth of work and savings. . . . . Additionally, the non-profit organization that I run was also victimized.  The impact of this crime on the The Elie Wiesel Foundation for Humanity ("Foundation") and its mission in its entirely is best understood when one considers the magnitude of the assets invested.  Because the $15.2 million that the Foundation had under management with Bernard Madoff Investment Securities represented substantially all of the Foundation's assets, the dissipation of these funds meant a crippling inability to

---

[1]   The defendant has admitted to the forfeiture allegation of $143.1 billion in the Information and agrees to forfeit $143.1 billion, representing the amount of proceeds obtained as a result of the commission of the offense in Count One.  (Plea Agmt. p. 2; PSR ¶ 169).

[2]   Prior to sentencing, the Government will compile all submissions and provide them to the Court and counsel.

> meet outstanding obligations in both the immediate short term as well as long
> term. . . . The impact of the Madoff crime was injury and threat to the very core of
> the Foundation's existence and its programs.  (Marion Wiesel)

Notably, Madoff's sentencing brief in this case does not even acknowledge the impact of

his crimes on the victims.  Given the extent of the deception perpetrated by Madoff and the harm

to victims from his crimes, the Government respectfully submits that the nature and

circumstances of his offenses warrant the imposition of the Stipulated Guidelines Sentence of 10

years' imprisonment.

### 2.      History and Characteristics of the Defendant

Madoff repeatedly lied to and violated the trust placed in him by individuals and

institutions that invested with BLMIS.  He also made numerous false statements to regulators and

auditors.  In so doing, Madoff, a lawyer, demonstrated his lack of respect for the law.  He acted

with disregard for the financial security of the thousands of BLMIS investors.  In addition, the

duration of Madoff's criminal conduct speaks for itself.  His crimes began at least in or about

1996 and continued until December 2008, when BLMIS collapsed.  The demise of BLMIS was

the only reason the defendant's crimes stopped.

Although Madoff could have ended his scheme at any time, he chose not to do so and

continued to be paid handsomely by BLMIS.  Even in late 2008, when he knew that the collapse

of BLMIS was imminent, Madoff did not turn to law enforcement.  Rather, he took additional

steps to enrich himself and his family.  His actions in 2008 demonstrate his character.  Rather

than contacting law enforcement, Madoff participated in a scheme to attempt to distribute the last

remaining $300 million of BLMIS investors' funds to his own family and close friends.  Madoff

reviewed lists of BLMIS investors and determined which ones should receive the remaining cash,

putting the interests of his family and friends ahead of the vast majority of IA clients.  On the day

before the collapse, Madoff also withdrew $200,000 from a BLMIS bank account for himself.

Further, as discussed above, Madoff did not commit his crimes in the face of any

financial duress.  To the contrary, he was fully capable of making a living lawfully and his crimes

served to enrich himself and his family by millions of dollars.  Madoff had every opportunity to

succeed in life through legitimate work, given his education, law degree, securities licenses and

close family.  Rather, Madoff instead chose to abandon honest work to pursue riches through

ongoing criminal activity.  He used the proceeds of those crimes to enjoy a lifestyle that included

lavish homes on Park Avenue in New York City, in Palm Beach, Florida, and in Old Westbury,

Long Island – each worth several million dollars.  (PSR ¶¶ 110-112).  He received sham "loans"

and profits from sham stock trades from his brother Bernard L. Madoff to finance some of these

homes as well as his lavish lifestyle.  Almost all of the approximately $25 million in "loans" and

sham stock trades that the defendant received came out of the IA investors' funds held in the IA

Bank Account.  If these millions of dollars were not enough, Madoff sought to further enrich his

family by directing that his wife be paid approximately $100,000 to $160,000 a year for a no-

show job for more than ten years, and receive other employee benefits, to which she was not

entitled.  All of these crimes speak to the defendant's character.

### 3.        The Need To Afford Adequate Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to

criminal conduct," 18 U.S.C. § 3553(a)(2)(B), also must be considered.  Here, the Government

respectfully submits that the Stipulated Guidelines Sentence is necessary to serve this purpose.

The crimes committed through BLMIS have shaken investor confidence and endangered

the financial stability of numerous institutions and individuals.  The deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any individual or institution tempted to engage in similar conduct.  The need for deterrence is especially important at smaller institutions like BLMIS – a private company – where individuals may operate under the mis-impression that they are "under the radar," and can avoid scrutiny or significant jail terms.  Further, given Madoff's role as the Chief Compliance Officer of BLMIS, the person responsible for ensuring compliance with the rules and regulations of an investment advisor that held billions of dollars of customer money, the need for deterrence is significant here.  The Government respectfully submits that a sentence is necessary that will deter others who are entrusted with similar responsibilities from abdicating those responsibilities as Madoff did.

### 4.    The Need To Avoid Unwarranted Sentence Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities."  Any comparison of Madoff's case to recent, long-lasting and substantial fraud cases prosecuted in this District – for example, Bernard Ebbers (WorldCom; 25 years), John and Timothy Rigas (Adelphia; 12 and 17 years, respectively, on re-sentencing), Phillip Bennett (Refco; 16 years), Samuel Israel (Bayou; 20 years), Joseph Shereshevsky and Steven Byers (Wextrust Capital; 21 and 13 years, respectively) – warrants a sentence of the Stipulated Guidelines Sentence of 10 years' imprisonment in this case.  The defendants cited above engaged in serious, ongoing criminal conduct meriting severe punishment, as Madoff does.

### 5.    The Need To Provide Restitution

Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any

18

victims of the offense" in fashioning a sentence.  Restitution to persons "directly and proximately

harmed" by the defendant's crimes is mandatory.  18 U.S.C. § 3663A(a)(1).  To effect restitution,

the Court is authorized to determine a restitution amount and schedule at sentencing.  There are

cases, however, where the Court may determine that an order of restitution is not appropriate

because the "number of identifiable victims is so large as to make restitution impracticable," or

because the determination of complex issues of fact related to the cause or amount of the victim's

losses would complicate or prolong the sentencing process to a degree that the need to provide

restitution to any victim is outweighed by the burden on the sentencing process," 18 U.S.C. §

3663A(c)(3).  Where restitution is found to be impracticable, the Government is authorized to

compensate victims through the process of remission authorized under the forfeiture statutes and

related regulations.  21 U.S.C. § 853(i); 28 C.F.R. Part 9.  Based on the difficulties presented in

the reconstruction of victim loss in this case, the Government, by separate motion, will move the

Court for an Order finding that restitution under Section 3663A(c)(3) is impracticable.  Such a

ruling would trigger recompense to the victims of the defendant's offenses through the well-

established process of forfeiture and remission administered by the United States Department of

Justice ("DOJ").  *See* Order in *United States* v. *Bernard L. Madoff*, 09 Cr. 213 (DC), dated

September 24, 2009 (finding restitution impractical and permitting the Government to proceed

with remission).  As set forth more fully in its motion, the Government submits that the goal of

victim compensation can be addressed appropriately through the process of remission – a process

that the Government has employed in other cases of large-scale fraud.  *See, e.g.*, *In Re W.R. Huff*

*Asset Management Co., LLC*, 409 F.3d 555, 563-64 (2d Cir. 2005) (prosecution of owners of

Adelphia Communications Corp).

19

## CONCLUSION

As set forth above, the Government respectfully submits that a reasonable sentence in this

case would be the Stipulated Guidelines Sentence of 10 years' imprisonment.

Dated:   New York, New York
         December 13, 2012

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

                        By: _____
                              LISA A. BARONI
                              JULIAN J. MOORE
                              MATTHEW L. SCHWARTZ
                              Assistant United States Attorneys

20