UNITED STATES DISTRICT COURT      **REDACTED**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                            :
UNITED STATES OF AMERICA        :
                            :
           -v-            :     S7 10 Cr. 228 (LTS)
                            :
PETER MADOFF,             :
                            :
                Defendant.   :
------------------------------------------------------------x

## SENTENCING MEMORANDUM

John R. Wing
Charles T. Spada
Jeannie Rose Rubin
LANKLER SIFFERT & WOHL LLP

500 Fifth Avenue, 33rd Floor
New York, New York  10110
(212) 921-8399
*Attorneys for Defendant Peter Madoff*

LANKLER SIFFERT & WOHL LLP

ATTORNEYS AT LAW

33RD FLOOR
500 FIFTH AVENUE
NEW YORK, N. Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX    (212) 764-3701

December 6, 2012

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY  10001

Re:    **United States v. Peter B. Madoff, S7 10 Cr. 228**

Dear Judge Swain:

Peter B. Madoff is scheduled to be sentenced by Your Honor on December 20,

2012, following his plea of guilty to one count of conspiracy to violate various federal statutes

and one count of falsifying books and records of an investment adviser.  This letter is

respectfully submitted to provide the Court with certain facts and circumstances relevant to

sentencing.

Peter Madoff, 67 years of age, has never before been charged with or convicted of

any crime.  He is a devoted husband of 45 years, father of two beloved children (one deceased),

and grandfather to two girls whom he often babysits and with whom he has shared a close bond

all their lives.  For the better part of his life Peter Madoff worked extraordinarily hard to manage

and develop the legitimate market making and proprietary trading business at his brother's firm,

Bernard L. Madoff Investment Securities LLC ("BLMIS"), while often extending himself to help

394940-1

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **2** of **43**

other people.  Notwithstanding his admitted wrongdoing, in some respects this case constitutes a

personal tragedy for an otherwise decent and compassionate man.  Although a clear beneficiary

of his older brother's largess, he was also a victim of his brother's Ponzi scheme and of that

brother's influence on his participation in the wrongful conduct that resulted in his guilty plea in

this case.

Peter Madoff acknowledges without reservation that his offense conduct was

wrong, is deeply ashamed, and struggles to comprehend his circumstances and his own conduct.

It is important to note, however, as indicated in the Draft Presentence Report ¶ 56, that Peter only

learned of his brother's Ponzi scheme on December 9, 2008, a few days before it was disclosed

to the world.

It is sad but true that Peter Madoff has already been punished far beyond

sanctions normally imposed for the offenses involved here.  His punishment began long before

his plea in this case when his brother first disclosed to his family and the authorities the fact of

his brother's Ponzi fraud.  As Peter noted in his allocution:

> In December 2008, when my brother told me about his fraud, I was
> in shock and my world was destroyed – I lost everything I had
> worked to build in my legitimate business at BLMIS; I lost my
> reputation, and any future ability to support my family financially;
> my family was torn apart as a result of my brother's atrocious
> conduct; and I became reviled by strangers as well as former
> friends who assumed that I had to know about the Ponzi scheme.
>
> At all times, I believed that BLMIS was successful and that my
> compensation was well-earned, and also that my brother had

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **3** of **43**

accumulated vast wealth that he used to provide me and my family
with various gifts of money.

In fact, as he noted at the time of his plea, Peter truly believed that his brother was

a brilliant securities trader and as a result he encouraged his own family to invest millions of

dollars in accounts managed by his brother.  As a result of his brother's fraud, Peter's wife lost

millions of dollars in her Madoff account and his daughter, granddaughter, sister and other

relatives also suffered losses.

Moreover, at the time of his plea this past June, Peter Madoff consented to a

draconian forfeiture order that in one stroke stripped him of all existing assets, his home, his

pension, his savings, his personal property, etc. and of all future assets and income should he

even have the opportunity to earn any income after serving his prison sentence.  After a lifetime

of hard work this man has been denied the ability even to collect social security.

In short, Peter Madoff has accepted responsibility and attempted to atone for his

misconduct by entering a guilty plea and consenting to a massive forfeiture that will effectively

render him penniless for the rest of his life.  Peter's life has been shattered by his brother's Ponzi

scheme as well as his own conduct and guilty plea, and he will almost certainly live out his

remaining days as a jobless pariah, in or out of prison.  There is certainly no chance that he will

repeat any of the offense conduct or any other illegal conduct.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **4** of **43**

### I.   <u>**Offense Conduct**</u>

On June 29, 2012, Peter Madoff pled guilty to conspiracy and falsifying records

of an investment advisor.  He has accepted responsibility for his conduct, which he knows was

wrong, and is deeply ashamed of his conduct.

For the 39 years during which Peter worked for his brother, Bernie Madoff was

the sole owner of the business and there was no doubt that Bernie was the boss; he never gave

Peter any financial interest in the firm whose reported capital in 2008 was $700 million dollars;

he made clear to Peter that he would never be a partner in his business, and Peter rarely

challenged him.  However, Bernie appreciated that Peter had worked hard to successfully build

the BLMIS market-making business, and he rewarded Peter with substantial compensation and

gifts.  This was especially true during the period 2000-2008, after Peter's battle with bladder

cancer in 1999 and as his son Roger struggled with and ultimately succumbed to cancer in April

2006.

On several occasions, at Bernie's instigation, Bernie and Peter engaged in money

transfers in ways specifically designed to avoid payment of taxes.  Peter has acknowledged that

he knew that this conduct was wrong.  In addition, at Peter's request, his wife Marion was placed

on the BLMIS payroll and for many years received compensation for a no-show job.  At no time,

however, did Peter ever suspect that his brother had stolen from anyone or that he or his family

were receiving money that belonged to customers of his brother's company.  At all times, he

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **5** of **43**

believed that BLMIS was successful, that his compensation was well-earned, and that his brother

had accumulated vast wealth that enabled him to provide Peter and his family with substantial

monetary gifts.

      With respect to the conspiracy charge, Peter pled guilty because he conspired with

others to commit several violations of law: (i) attempts to interfere with the administration of

internal revenue laws; (ii) falsifying the books and records of an investment adviser; (iii) false

filings with the SEC; and (iv) mail and securities fraud:

      As to the interference with the administration of internal revenue laws, Peter

conspired with others to prevent the IRS from collecting proper tax revenue in three different

ways.

- First, he received various fringe benefits from BLMIS, including meals, travel, leased cars, country club costs, apartment rentals, payment of household employees, and life insurance premiums, which he failed to report on his income tax returns. In addition, because he had placed his wife on the BLMIS payroll, although tax was paid on her income, he caused her to receive untaxed 401(k) contributions to which she was not entitled.

- Second, in 2005, Bernie gave Peter a substantial sum of money in the form of a completed securities transaction when Peter asked for financial help to enable him to buy a one-floor apartment for his son Roger, who then was in a wheelchair, which made it difficult for him to live in his duplex apartment. At the same time, Peter also asked for an equal amount of money to give to his daughter. Bernie offered to give Peter substantial monies in response to this request by giving him profits from one of his completed stock transactions and Peter agreed. In 2005, in order to avoid the payment of tax on the transfer from his brother, Peter and Bernie treated the stock transaction as though it had occurred in Peter's account rather than in Bernie's. In 2002 in order to avoid the payment of tax on a similar transfer from Bernie to Peter, they treated a similar stock transaction as though it

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **6** of **43**

had occurred in Peter's account rather than Bernie's. Although Peter now knows that Bernie's stock transactions were not real, he believed at the time that they were legitimate transactions.

- Third, in 2005, 2007 and 2008, Peter received money transfers from his brother that he used to provide his children with substantial sums of money. Although he had no expectation of repayment, he required his children to execute promissory notes for the amounts provided in order to avoid gift tax. On a number of occasions Bernie provided Peter with substantial sums of money that Peter had no intention of repaying, and some of these transfers were documented as loans in order to avoid tax.

As to the objects of the securities fraud, false filings, and falsification of the books and records of an investment adviser, in 2006-2008 Peter knowingly signed and/or approved false compliance documentation that he knew was maintained as part of the books and records of BLMIS as a registered investment advisor:

- In July 2006, three months after the death of Peter's son Roger, Bernie informed Peter that BLMIS was going to register with the SEC as an investment adviser because of Bernie's management of customer accounts. In September 2006, when BLMIS first registered as an investment adviser, Peter was designated as the Chief Compliance Officer of the customer business. At that time he did not have any substantive experience or knowledge of the rules governing Investment Advisers. The ADV form, which was reviewed and approved by a Wilmer Cutler lawyer and filed with the SEC, provided that Bernie's trades in his clients' advisory account were to be reviewed daily by Bernie or Frank DiPascali, and Peter's responsibilities were only to ensure that those reviews were being performed and that this procedure was adequate. However, as Chief Compliance Officer, Peter failed to implement any meaningful supervision over his brother's management of the customer business and failed to test or confirm his brother's representations that he was trading and managing the Investment Advisory accounts in compliance with the customers' directions. Peter simply accepted Bernie's word that he had done so. Nevertheless, Peter approved and/or signed, as chief compliance officer, certifications that he knew at the time were false because he had made no effort to perform a meaningful compliance review or to test the adequacy or effectiveness of the procedures as related to his brother's management of customer accounts.

L A N K L E R  S I F F E R T  &  W O H L  LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **7** of **43**

- In addition, in 2006 and 2007, Peter allowed Bernie to file with the SEC an investment adviser registration form on behalf of BLMIS that he knew contained certain false and misleading statements.  For example, at Bernie's direction, the form falsely stated that BLMIS had only 23 investment advisory accounts.  Although Peter did not know the true number of accounts, he did know at the time that there were many more than 23 accounts and that he could not rely on Bernie's claim that he only had to register and report on a limited number (23) of institutional and high net worth accounts.  He failed to include in the investment advisor registration form the material fact that Bernie was only registering for a limited number of accounts and that they were not reporting the true number of accounts or money under management or other relevant facts relating to the size and activity of Bernie's customer business.  Peter knew that the misstatements on the form allowed his brother to conceal the true extent of his customer business, as well as the fact that some of his accounts were referred by another brokerage firm in return for compensation.

Peter also conspired with others to falsify employment and payroll records of BLMIS, including false records that were filed with the Department of Labor, to allow his wife to receive compensation and benefits as a no-show employee.

Finally, as to the securities fraud and mail fraud objects of the conspiracy, when Peter first learned of the Ponzi scheme in December 2008, he agreed to assist his brother, who was planning to pay out remaining customer funds to a limited number of customers – specifically family, friends and employees – thereby depriving the remaining investors of the opportunity to share in those funds.  On the night of December 9, 2008, Bernie told Peter that his investment advisory business had been a Ponzi scheme and that only a small fraction of the customer funds remained.  Bernie told Peter that he had made an appointment with his lawyer, Ike Sorkin, and was planning to turn himself in to the authorities.  Bernie told him that he was planning to redeem the customer accounts by mailing redemption checks to friends, family, and

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **8** of **43**

employees, and he asked Peter to review a marked-up customer list to identify any additional

people who should share in the limited remaining funds.  Peter was shocked and devastated, but

nevertheless he did as his brother asked, as he consistently had done for decades.  Although the

redemption checks from BLMIS to customers were never mailed (Bernie was holding them until

he could receive advice from Sorkin), Peter knew that his conduct was wrong.

   With respect to the count of falsifying books and records of an investment

adviser, as a registered investment adviser, BLMIS was required under SEC rules to make and

keep accurate books and records.  As previously explained, Peter approved and/or signed

documents that included false statements relating to compliance procedures and also participated

in his brother's preparation and filing of a false BLMIS investment adviser registration Form

ADV.

   Peter's guilty plea was accompanied by a massive forfeiture in which he agreed to

forfeit all of his existing and future assets and income and submit to a forfeiture judgment in the

amount of over $143 billion dollars, essentially guaranteeing that he will live out his years in

absolute poverty.

   In addition, Peter's plea agreement required him, prior to the date of sentencing,

to "file accurate amended personal tax returns for the calendar years 1998 through 2008."  Plea

Tr. at 27; Plea agreement at 2.  The task of marshaling relevant documents and information

(much of which was in the possession of the government, and some of which is simply

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page 9 of 43

unavailable) to enable him to prepare over a decade's worth of complicated amended tax returns

has proved to be tremendously onerous – particularly given that Peter has no tax expertise and,

because he has no assets, has been unable to retain a tax professional to assist him in this

Herculean duty.  Under the circumstances, it is impossible for Peter to ensure that all of the

amended returns are perfect.  In an effort to take full responsibility for any potential tax liability,

however, on his amended returns, Peter has included as income substantial assets that he

believed to be gifts from his brother (and thus not reportable as income to Peter) but that he now

understands, based on certain aspects of the tax law, the government may view as income to

him.[1]

Peter Madoff has acknowledged that the conduct for which he pled guilty was

wrong and a serious mistake for which there is no excuse.  The stipulated guidelines sentence

agreed to in the plea agreement calls for ten years of imprisonment.  The plea agreement contains

a provision that the parties will not seek a sentence other than the stipulated guidelines sentence

of ten years in prison.  However, the plea agreement also acknowledges that "the sentence to be

imposed upon the defendant is determined solely by the Court," and permits counsel to bring to

the Court's attention "any facts relevant to sentencing."  Accordingly, set forth below are certain

---

[1] At the time of the transfers, Peter had a substantial basis for believing that these amounts were not required to be
reported as income because they were gifts from his brother.  *See, e.g., Hughes v. Commissioner*, T.C. Memo 1992-
438 (concluding that transfers from petitioner's brother to brother were gifts, not income); IRS Proposed Reg. §
1.102-1(f)(2) (if the employer and employee are related family members and the purpose of the transfer can be
substantially attributed to the familial relationship and not the circumstances of the employment, the amounts may
be treated as gifts and not compensation).  He now understands that under *Commissioner v. Duberstein*, 363 U.S.
278, 285-86 (1960) and its progeny, transfers from an employer to an employee, notwithstanding the fact that the
transfers came from a company owned by a family member, generally are treated as compensation for past or future
services.  *Commissioner v. Duberstein*, 363 U.S. 278, 285-86 (1960).

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **10** of **43**

facts concerning Peter Madoff's background, conduct, character and family situation which we
believe to be "relevant to sentencing."

Aside from the offenses for which he has pled guilty, Peter Madoff's personal
history reflects that he has conducted much of his life and his business with integrity and
significant concern and compassion for others. The letters that the Court has received on Mr.
Madoff's behalf confirm this in countless ways and speak far more eloquently of his basic good
character and decency than anything his lawyer can say.

## I.       Background

### A.       Family Life

As many of the letters submitted on Peter's behalf explain, his life always has
been defined by his family – by his relationship with his parents, his sister, his wife of 45 years,
his children, grandchildren, extended family, and tragically, most of all his brother Bernie.

Peter Madoff was born in 1945 to Ralph and Sylvia Madoff and spent most of his
childhood in the Queens town of Laurelton. Peter was the youngest of three children. His
brother Bernie was eight years older. Although the family struggled financially Peter was very
close to his parents and he recalls his family as generally loving and happy.

As a child, Peter looked up to and competed with his brother Bernie. Their
mother viewed Bernie as the prince, and Peter longed for the love and approval of his brother

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **11** of **43**

and family.  Peter had a large build, and Bernie ridiculed him mercilessly, calling him "Rollo,"

which hurt Peter deeply.  One friend recalled that even as an adult, Peter's friends were struck by

his view of himself as "a fat boy who always wanted to do the right thing, a little fat boy who

wanted so much to please his father, and his older brother.  He was the younger brother who

always remained in his brother's shadow."

        Peter Madoff has worked almost his entire life.  As a teenager, Peter delivered

newspapers and sold greeting cards to make spending money while he attended Brooklyn

Technical High School, where he excelled both academically and on the football field.  Even in

his teenage years, Peter chose his family over his own dreams:  when he was accepted to attend

Brown University, he chose instead to attend Queens College because it would be financially

easier on his family.

        Peter married his high school sweetheart, Marion Schwartzberg, in the spring of

1967, and enrolled in Fordham Law School later that year.  He graduated from law school and

passed the bar in 1970.  Although Peter had hoped to work for the SEC, he instead gave in to

Bernie's plan (and his father's dream), and agreed to work for his brother in Bernie's then small

firm.

        In the following years, Peter and Marion welcomed two children – a girl, Shana,

born in 1970, and a boy, Roger, born in 1973.  Peter's love and devotion to his children was

boundless.  Roger was born with allergic asthma, and for Roger's first three years of life, Peter

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **12** of **43**

and Marion would take turns sitting up watching him breathe as he tried to sleep. Peter would then leave at 5:30 in the morning to commute to work. There were many times he fell asleep on the train and woke up in the New York train yards or in Ronkonkoma on the way home.

After Roger's health improved, Peter continued to commute to work on the 5:30 a.m. train and stayed late, working tirelessly to build his market-making trading business. But weekends were family time. Peter and Marion would prepare breakfast for the kids, and Peter would hear about the children's week. Peter cherished the time connecting with his children.

Both children excelled in their studies as well as extracurricular activities, and Peter took deep pride in even the most mundane of their accomplishments. A friend of Peter and Marion's for over 30 years, recalls Peter's devotion to his family: "I do not know anyone who was a more involved father and husband while maintaining a high pressure position in a stressful industry. . . . He talked constantly of his children with great pride and knew more details of their lives than any father I knew."

After high school, Shana chose to attend the University of Michigan, and later followed in her father's footsteps, graduating from Fordham Law School and joining BLMIS in 1995 at her father's suggestion. Roger chose Duke, where he became editor of the Duke Chronicle, the school newspaper, and later became a journalist for Bloomberg News. Both children wanted to be like their father: loving, generous, caring, and happy to wake up every morning.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **13** of **43**

      Peter's love for and support of family extended well beyond his immediate family – to nieces, nephews, in-laws, and former in-laws, and their children, and even family friends, all of whom he loved unconditionally and supported in many ways, big and small.  One of Peter's nephews fondly recalled how Peter and Marion often visited when he was a child and took great joy and pride in their extended family throughout their lives:

> They would come out to Smithtown on Sundays to watch the Giants game, Peter would go up on the roof to turn the antennae so we could get the broadcast from Connecticut.  He'd play touch football with us kids.  They'd bring their dog so he wouldn't be alone all day.  We had extended family dinners, not just on the holidays, we saw them often.

> When my relationships with my aunts, uncles, and cousins drifted in adulthood to mainly seeing them on holidays and at weddings and funerals, it was Peter and Marion who stayed involved in our lives. . . .

      Similarly, Peter's niece explains:  "Simply put, Peter loves his family.  Peter has always loved his family.  He loves the idea of family, the noise of family, the strength and devotion of family, the stories, the teasing, the familiarity and the history of family. . . ."  She recalls:

> During the holidays Uncle Peter would stay in the kitchen talking up a storm.  He talked to the kids, not just the adults.  He'd take us outside for a football game in the yard and gently pulverize us. He'd show up on any given Sunday, not just the holidays, because he wanted to visit.  He wanted to be with us. . . .  He once spent 30 minutes debating with my then 7 yr. old son about the status of Pluto or something like that just because my son wanted to show off.  My Uncle Peter wants to know us.

LANKLER SIFFERT & WOHL LLP

The wife of Peter's nephew remembered that while she was intimidated before meeting the Madoffs, "from the moment I met Peter and Marion Madoff I felt like I had known them forever. They both welcomed me into their home and made me feel like part of the family." Similarly, the former wife of Peter's nephew Mark recalls that Peter was always welcoming and loving with her from the beginning of her relationship with Mark, and continued to make her feel like family, and to love, support, and worry about Susan and her children, long after Susan was divorced from Mark – and particularly after Mark's tragic death. She notes that even now, as Peter faces a prison sentence, he continues to be more concerned for Susan and her children than for himself. Susan and Mark's son (a college student) writes that since his father's death,

> People don't always say the right thing to me when they want to be sympathetic. But Peter has always been one of the people in my life who I could count on for genuinely kind words. I know he loved my father as I did, and being in his company somehow soothes some of my pain.

> Peter Madoff is a family man and has more concern for others than he does for himself.

Peter's niece echoes this sentiment, noting that "no matter what he's facing, he still returns every phone call and email even if I just wrote to send him my love. That's what he does, he puts everyone in his life ahead of himself." Another niece noted that when she called upset about Peter's plea, Peter told her that he would be okay and that he was concerned about her parents, and urged her to care for them. The husband of one of Peter's nieces echoes this same sentiment, noting that Peter "would go above and beyond quietly to help anyone in need," and that Peter

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **15** of **43**

and Marion "have shown nothing but love and kindness to all around them."

Peter was always there for his family when needed. His nephew notes that while his side of the family was never wealthy, Peter always welcomed them into his home "without judgment or condescension, and with genuine warmth." When he started his freshman year at NYU, Peter picked him up at the airport, took him to dinner, and helped him move in. Years later, when he moved to New York without a job, Peter welcomed him to stay at his home. When Marion's mother became ill, Peter and Marion made accommodations in their home so Marion's parents could stay with them during her mother's illness and after.

After Peter's father died, Peter also continued to care for Bob Kay, an ill, cognitively disabled friend of his father's who had no other family. Peter's niece recalls at family gatherings,

> in-laws, friends, people from the firm, college roommates, just
> about anyone who was alone on the holiday found a place at Peter
> and Mari[o]n's table. Family is the heart of my Uncle Peter and
> has always extended beyond blood. As a child I was never quite
> sure who Bob Kay was. He was a sweet elderly man always in
> attendance at Pete and Marion's gatherings. As an adult I learned
> he was a childhood friend of my Grandpa Ralph. Bob was 'slow'
> and could not care for himself independently. My grandfather
> helped support him, later Peter took on the role.

Peter's kindness and deep caring extended to just about everyone he knew, including employees. As his niece comments, "The lines of firm and family blurred, Peter took care of everyone." Peter's secretary Elaine Solomon recalls that from the time she began

LANKLER SIFFERT & WOHL LLP

working for Peter, she "knew immediately that this was a kind and generous man whose priority

was his family and the people he cared about."  Shortly after she started working for Peter, she

had nowhere to go for Passover, and Peter invited her and her husband to spend the holiday with

his family so that they would not be alone.  She notes that she and Peter were friends, not just

employer and employee:  "He genuinely cared about me and my family and working for him was

not a job, it was getting to spend each day with a family member that I actually liked!"

Similarly, friends of Peter's daughter Shana recall that when their plans fell through during the

holiday season, Peter, who was recovering from a medical procedure while also mourning the

recent death of his son, welcomed them and their three young children into his home and

"showed kindness to the point of seeming almost vulnerable."  The wife recalls that their

children, who were ages 5, 4, and 1 at the time,

> decided to get pots and pans from the kitchen and make a 'drum
> set' in the living room two feet away from Peter deeply engaged in
> the New York Times.  My husband trying to keep the 'band' under
> control was unsuccessful moving them to another room.  To our
> surprise, Peter's comment was, 'Joe, I don't hear noise, I hear the
> happiness of 3 kids, let them enjoy themselves.'  I am the mother
> of these 3 kids and I can tell you, 'I heard noise.'  My husband
> definitely heard noise too.  *Peter heard music.*

When Peter and Marion's son Roger dated and then married Jennifer Stevens,

Peter and Marion were delighted to welcome not only Jennifer, but her entire family, into their

family.  Jennifer's parents' letters describe how Peter and Marion treated them like family from

the first time they met, sharing holidays as well as meals together, in good times and bad:

LANKLER SIFFERT & WOHL LLP

> Thanksgiving [in addition to Passover and Rosh Hashanah] also
> became a joint holiday.  When Roger got sick, we had
> Thanksgiving dinner in the hospital waiting room, arranged by
> Peter.  At every dinner before eating, Peter would speak from the
> bottom of his heart, thanking us for sharing this time with him.  It
> didn't matter whether our hearts were full of joy or breaking with
> sadness.  Holidays are so important to Peter that everyone there is
> always grateful.  Tradition hasn't changed, we are still together at
> those times.

Jennifer recalls that when she was in graduate school for public health, Peter "insisted on being

one of about a dozen people in a small classroom during my dissertation defense."  Even when

Peter's beloved son Roger was ill and weak, Peter and Marion traveled with Roger and Jennifer

to a rural part of British Columbia – a difficult, several-hour drive from the tiny, closest airport –

to attend the wedding of Jennifer's brother.  Jennifer's sister-in-law recalls that even under those

circumstances, Peter made the effort to get to know her family and that she "was surprised to

discover how many people Peter had made a positive impression on. . . ."

Since Roger's tragic death, Peter and Marion have continued to love and support

Jennifer as a daughter, and have even developed a wonderful relationship with Jennifer's new

husband, Jacob, whom he refers to as his son-in-law.  Jennifer recalls that Peter has even made

special trips to their apartment just to take the puppy for a walk, and more importantly, "has been

an unwavering source of support as my husband and I have endured several difficult years of

miscarriages and fertility complications, regardless the pressures and stresses he is managing on

his own."  Indeed, Jennifer's husband describes Peter as his "adopted father-in-law," who has

been as emotionally supportive and proud of Jacob's accomplishments as Jacob's own parents.

Lankler Siffert & Wohl llp

Honorable Laura Taylor Swain
December 6, 2012
Page **18** of **43**

Jacob writes that he is "happy to be Peter's son."  In sum, as Jennifer's father writes, "Peter has

always been generous, honest, forgiving, loving, sharing, and basically much more gracious than

a blood family member."

In recent years, Peter's granddaughters, born to Shana in 2000 and 2009, have

been his pride and joy and have helped to sustain him through the tribulations of the last four

years.  Peter always has been deeply devoted to them.  His older granddaughter, R.S.,was born

when Peter was recuperating from bladder cancer and radical surgery.  Her birth spurred his

determination to make a complete recovery and to cut back his work hours to spend more time

with his family.  Shortly after R.S.'s birth, Shana and her first husband separated and later

divorced, making Shana a single parent.  During that time, as always, Peter was there for Shana

and R.S.  He would drop everything if he was called to get R.S. from nursery school, take her to

the doctor, or just to babysit.  R.S.'s letter describes their close "true bond," explaining that they

have spent more time together than most grandparents and grandchildren and they both cherish

their time together.

Peter also frequently babysits and has been devoted from birth to his second

granddaughter.  Peter's happiest times are those spent with his granddaughters.

To Peter, one of the most poignant aspects of his sentence is that he may be

unable to attend the Bat Mitzvah of his dear granddaughter R.S., whose religious education he

has supported with actions as well as encouragement.  The Rabbi has noted that "Peter has done

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **19** of **43**

everything possible to demonstrate to Shana and R.S. that no matter what the public shame and

embarrassment they have suffered there is no excuse for opting out of religious education or their

Jewish identity." R.S. also describes Peter's devotion to her religious education: in addition to

consistently taking her to Hebrew school and religious services, he is always there to help her

practice for her Bat Mitzvah – an experience that they have always looked forward to sharing.

B.      *Relationship with Bernie*

In stark contrast to the warmth of most of the family, Bernie's demeanor ranged

from standoffish to abusive. Peter loved to visit his family. Weekly visits with his sister

Sondra's family were marked by genuine joy and affection; aunts, uncles, nieces, nephews and

cousins ate together, played together and built life-long, close relationships. Visits with Bernie's

family were much less satisfying; Bernie was unwelcoming, and the children were usually sent

to the basement and not allowed to touch anything. Their sister's daughter recalls the contrast

between her two Uncles:

> My Uncles couldn't have been more different. I didn't see much
> of Bernie and when I did, it was uncomfortable at best. . . . He
> never seemed to want to be there and the obligation of his visit was
> apparent. . . . Peter on the other hand was happy, relaxed and in
> his element around us.

While Marion and Peter loved their nephews Mark and Andrew, and Shana and Roger remained

close to their cousins, the families visited less and less frequently due to Bernie's inhospitable

nature.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **20** of **43**

Bernie demeaned Peter personally, as well as his family and even his religious devotion. When it came to business, no one could question Bernie; Bernie would always have the last say: "My name is on the door." Yet no matter how insulting and degrading Bernie was to Peter, Peter would turn the other cheek, saying "family is family.'" One friend recalls: "What struck me as 'odd' was how Bernie never gave Peter full credit for all his hard work [on the Madoff company weekends at Montauk]. If one thing was not right, Bernie would find it and magnify its importance and never give Peter any compliments on what he accomplished during the weekend. Peter, always the 'peacekeeper,' never made waves and accepted Bernie's criticisms gracefully, never argued or patted himself on the back for all the things he accomplished to make the weekend a success."

Despite the abuse, Peter seemed to be blind to his brother's flaws. He loved, trusted, admired and even idolized his brother, believing him to be a trading genius – a view in which he was far from alone. Another friend reports, "Almost everyone I heard of or observed put Bernie on a pedestal. Everyone wanted to invest with Madoff. All the people we knew who invested with him were smugly proud they had."

When Peter's father – whom he dearly loved and always sought to please – passed away in the early 1970s, Bernie became a father figure to Peter. Peter's respect and admiration for his brother only grew over the decades, as Bernie became one of the most successful and best-regarded traders on Wall Street. Bernie held important positions within the industry, including Chairman of the NASDAQ. Among the most prominent members of the securities

LANKLER SIFFERT & WOHL LLP

industry – including high-ranking officials at the SEC – Bernie was widely viewed as one of the

most honorable as well the most successful traders of our time, and no one believed it more than

Peter did.  Peter revered him and trusted him implicitly.

It was clear to most people who knew Peter – either personally or professionally –

that Peter lived in Bernie's shadow, idolizing Bernie and longing for Bernie's approval, which

Bernie withheld.  A close friend for decades recalls:

> When he spoke about Bernie, it sometimes sounded as if Peter was
> a young boy, speaking about his idol. . . .  I only knew Bernie as
> seen through Peter's eyes.  He was the older brother who, when it
> came down to it, Peter worked for.  The brother Peter always
> wanted to please, the brother who would never really let Peter in,
> the brother with the power. . . .  Peter wanted to please others, and
> couldn't see himself as anything but the younger fat brother
> looking for approval from his idol.

A Director of A.G. Edwards with whom Peter served on that Board "always

perceived there was a mixed relationship, that with eight years age difference and everyone

knowing who Bernie was, Peter was the dutiful younger brother in many ways, but his

enthusiasm was making the technology run for their operation."  Another old friend observed

that "having lived and worked side by side with Peter and his brother Bernard Madoff I observed

how Bernie, who was the sole owner of the business, was a very dominant force in Peter's

personal as well as his business life.  Peter looked up to Bernie as his older brother, someone

who had accomplished leadership roles as well as fame and fortune in the securities world."

Similarly, another long-time friend recalls:

LANKLER SIFFERT & WOHL LLP

> Bernie is 8 years older than Peter and was already phenomenally
> successful in his field and considered a genius trader when Peter
> went to work for him straight out of law school.  He was like a
> father to Peter.  He had worked for Bernie in one way or another
> since he was a young kid.  He idolized his brother, wanted to
> please him, and did what he was told. . . .  [I]n wanting to be right,
> to please his brother and his family, he did what he was told, and
> he could not see what was going on under his nose, and
> jeopardized the very people he was trying to protect.  He was
> betrayed by the brother he idolized and betrayed by his idolization.

Although Peter built a reputable, legitimate, and valuable market-making

business, he always viewed himself as lesser to and dependent on his older brother Bernie, the

genius.

C.     *Peter's Bladder Cancer, Surgery, and Medical Condition*

In December 1999, Peter was diagnosed with bladder cancer.  He endured a

difficult, seven-hour operation in which both his bladder and his prostate were removed and the

bladder was replaced with a neo-bladder made of his intestines.  He spent fourteen days in the

hospital and recuperated at home for three months.

Peter did recover.  His cancer caused him to realize that life is short and delicate,

and upon his return to work, Peter scaled back his work hours to enjoy his family life.

Wherever possible, Peter also has sought to use his experience to help others.  For

example, a friend recalls that when he developed prostate cancer, Peter shared his experience

with procedures and doctors with his friend, and "as expected gave his help and support.  The

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **23** of **43**

conversations regarding this illness cover sensitive issues at best.  Yet Peter discussed them in a frank and comfortable manner that allowed me to gain much needed information without compromising my privacy."

D.    *Roger's Illness and Death*

In 2002, after Peter had survived bladder cancer and radical surgery, the Madoff family suddenly became plagued by cancer.  On November 19, 2002, just a little over a year after his wedding, Roger Madoff was diagnosed with Leukemia.  Within months, Peter's niece Ariel and his nephew Andy also were stricken with various forms of the disease.  Peter's niece recalls Peter's strength and devotion to the family:

> During that time, our family followed Peter[']s example of strength and optimism.  He was there for everyone, focusing on the positive.  He was tired and scared, you could see that but he was there not only for his son but for my niece and for Andy and for all of us who needed support.  He's a religious man with a deep faith in God, a deeper faith [than] most of the family I'd guess.  Uncle Peter wouldn't admonish us for this, he'd simply ask us to pray or send whatever positive energy we could for them all.

Another niece recalls: "My uncle Peter rallied to bring his intellect, heart, and deep sense of community to help not only Roger and Ariel but all victims of the disease through his work with the Leukemia and Lymphoma Society.  This commitment continued long after Roger died of the disease and my beautiful niece survived."  Peter's niece Ariel, who was diagnosed with Leukemia at age eight, recalls that Peter became one of her "best friends," who always remained positive and helped her to see the bright side, even as he struggled with Roger's

Lankler Siffert & Wohl llp

Honorable Laura Taylor Swain
December 6, 2012
Page **24** of **43**

illness.  Ariel, who is now a freshman in college, comments that "Peter is one of the best people I

know. . . ."

Roger's struggle raged for over three years, during which Roger was in and out of

the hospital.  During that period, Peter's devotion to caring for his son was complete and single-

minded.  Peter dedicated every day to finding the right treatment and the right doctors for his

son.  He prayed every morning and evening.  He went to the Rebbe's grave and wrote notes to

pray for a recovery.  When Roger was in the hospital, Peter was there with him at 7 a.m. and

stayed until 11 a.m., so that he could speak to the doctors and take Roger his favorite breakfast

foods, as well as fresh cookies, bagels and bialys for the hospital staff.  Roger's widow Jennifer

recalls:  "When Roger was in the hospital, and I mean every single day that Roger was in the

hospital, Peter was the first visitor in the morning – bringing his son, a voracious reader, a copy

of the *Times*, the *Journal* and the *Post* (for the sports), and, if Roger's diet wasn't too restricted

because his immune system was functioning well, a bagel and a coffee."  Peter and Roger would

have their morning talks about the world, discussing politics, the market, the Mets, Giants and

Rangers, and cars.  Then Peter would go to the office, check out the trading room, deal with the

immediate trading problems of the day, and then return to the hospital each night.

Roger's transplant doctor , Tsiporah Shore, M.D., recalls not only Peter's

devotion to his son, but also his kindness to everyone – his own family, the family of other

patients, the doctors, and the staff – during this agonizing period:

LANKLER SIFFERT & WOHL LLP

Despite the horror of watching his son struggle and eventually die of this terrible disease, Peter Madoff was one of the kindest relatives that our staff encountered. Many parents in this situation, as you can guess, would not be at their best. But Peter was always there for Roger. He was always there for Roger's young wife, Jennifer. He gave them their space as a young couple but he was their rock. Every single day, he came to the hospital before he went to work and every single day, he came back to be with Roger in the evening. Even when he himself had some health issues, he minimized them to be with Roger. He brought bagels and cream cheese for the nurses every morning when he would come to the ward. He thanked staff members for whatever they did. He asked us how he could be of more help; he never took his anger out on us for the situation that their family was facing with respect to Roger's illness. In his own quiet way, he supported his wife, his daughter (the donor), his son, and his daughter-in-law with love, and showed heartfelt kindness to all the staff from doctors to cleaning ladies on the ward. Our whole staff grew to love the family and we all grieved when we lost Roger. Of course, our grief was nothing compared to the horror that Peter, Marion and Jennifer suffered.

Dr. Shore recalls that when Peter learned that another Jewish family was facing leukemia and was unable to go home for Passover, Peter brought them home-cooked food from his own seder. (The patients had to be isolated, so they could not share Passover together.)

Throughout Roger's illness, Peter, the eternal optimist, believed Roger would be fine. He joined with family and friends in support of the Leukemia and Lymphoma Society's biggest fundraiser, the "Light the Night" walk across the Brooklyn Bridge, praying that the following year Roger would walk with them as a survivor. Peter's belief that Roger would recover never changed, and his positive attitude helped the whole family to cope. The mother of Roger's widow Jennifer recalls the strength and comfort that Peter offered their family amid his

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **26** of **43**

own anguish:

> I think what enabled me to get through this horrific time was
> Peter's positive attitude.  He made you believe that Roger was
> going to make it.  One day I was in a car with one of his
> employees, Sanky.  I told him how much I admired Peter for his
> strength in dealing with Roger's illness.  He told me that every day
> when Peter left the hospital he cried to him and said, "Why
> couldn't it be me!"

Jennifer also writes about the love and support that Peter provided throughout (as

well as after) Roger's illness and death:

> As much as Peter was there for Roger when he was sick, Peter was
> a tremendous support for me during and since Roger's illness and
> death.  Peter was a source of support during the many sleepless
> nights and horrible days that Roger wasn't well, and I could always
> count on him to be at home or in the hospital, if there was some
> reason that I couldn't.  He was a voice of reason and a partner in
> making the hardest decisions anyone should ever have to make
> about their spouse or child.  Together, we talked Roger through
> moments of delirium during stays in the ICU; together, we sat in
> waiting rooms holding our breath during dozens of procedures;
> together, we soothed Roger during panic attacks about his
> impending mortality; together, we listened to doctor's diagnoses
> and worsening prognoses about his condition to assure one another
> about what we were hearing and hold onto each other for strength;
> together, we signed Roger's "Do Not Resuscitate" order as his
> health care proxies; together, we watched as Roger slipped into
> unconsciousness for the last time on his last day; together, we
> watched him take his last breaths and held his hands as we said
> goodbye.  After living through what we've lived through together,
> Peter and I are bonded for life.

During the last weeks of Roger's life, Peter slept at the hospital to make sure

Roger was not alone, was receiving the best medical attention available, and was comforted to

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page 27 of 43

the extent possible. Peter even had a new mattress brought in at 3 a.m. one night when Roger

was in constant pain. He did everything a parent possibly could do to care for his son.

On April 15, 2006, Roger succumbed to complications of Leukemia, and

everyone who knew Peter and Marion could see their heartbreak. One friend recalls that

"Marion and Peter were surrounded by so many friends, but nothing could or would ease their

pain." Peter's secretary notes that "[t]hrough it all Peter showed dignity and continued to be the

charitable and caring man that I knew but it was as if the light of life was gradually being

diminished." The ex-wife of Peter's nephew Mark Madoff, observes: "I know that something

broke inside Peter when Roger died. He wrote me a letter soon after beseeching me to hold onto

each day with my children and make every moment count." Peter and Marion were devastated

and relied on each other to make it through their mourning, which lasted far beyond the Jewish

traditional year. Indeed, they continue to mourn their son today. Dr. Shore noted that Peter and

Marion have "not recovered emotionally and I don't know if they ever will."

Yet even in this most devastating experience, Peter looks for goodness, trying to

use his harrowing experience to comfort and help others. The founding president of the Lower

East Side Tenement Museum, a friend of the Madoffs, recalls: "Standing helplessly by, I

watched with admiration as Peter grasped his whole family to him, and in the midst of his grief,

organized fundraising walks for the Leukemia Foundation. Something good, he told me, needed

to come from Roger's death. And it did." Peter and Marion have continued to support the

Leukemia and Lymphoma Society and to organize others to participate in the annual "Light the

LANKLER SIFFERT & WOHL LLP

Night" event.  In addition, Peter has consistently offered whatever guidance and support he can

to loved ones of others afflicted with cancer.  Rabbi Rubinstein explains:

> Above all I have been struck by Peter's comments during sessions
> of a monthly parent bereavement group which I co-lead for parents
> who have suffered the death of a child.  Peter and Marion's son
> Roger died of leukemia in April 2006.  It became clear to me that
> along with his nephew's suicide Peter has been sobered by these
> life-changing events.  Yet even in the midst of the constant sadness
> that infuses the lives of parents who have been devastated by the
> out-of-order reality of burying a child, Peter demonstrated constant
> sensitivity to the pain of others.  He tried to raise their hopes and
> joined them in together believing that pain doesn't go away, it just
> "becomes different."  Peter has never demonstrated an unhealthy
> dose of self-pity but has rather embodied an acute and decent
> compassion for others who suffer.

Others have observed Peter's willingness and sensitivity in offering support.  One

friend recalled that "At one point I had asked Mr. Madoff if, with his unfortunate experience in

losing a child, he would speak to a friend of mine who had also suffered this kind of loss and he

unhesitatingly agreed to do so.  Many would not have done so.  It is to his great credit and

sensitivity that Mr. Madoff reached out to this stranger to give whatever support my friend was

able to accept." An A.G. Edwards director recalled that after Roger's diagnosis, his best friend

was diagnosed with the same type of cancer:  "Peter's patience in pointing me to sources of

advice, medical alternatives, etc. continued, even after Roger died. . . ."

Peter and Marion contributed to Roger's book Leukemia for Chickens, which

Jennifer had published posthumously, and which Peter distributes to families of those afflicted

with the disease.  In addition, Peter worked with Bloomberg News and Duke University to

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **29** of **43**

establish a scholarship and summer internship, in honor of Roger.  Each year, Peter personally

traveled to Durham to interview candidates and select the candidate who best represents the

memory of his son.

E.        *Work History*

After working at BLMIS part-time during law school, Peter went to work for his

brother full-time upon graduation in 1970.  As the years passed Peter became aware that Bernie

was widely regarded as a genius investor, and that the rich and famous – and financially

sophisticated – admired and sought to have accounts with him.  Peter was focused on building

the legitimate market-making business and it was clear that Bernie did not want Peter to be

involved in Bernie's customer business.  Leonard Mayer, who worked with Bernie and Peter at

BLMIS, recalls:  "On many occasions I observed Bernie clearly telling Peter that it was 'his

name on the door' and that Peter should stick to running the market making and automated

trading systems and leave the rest to him."

Peter loved his job and took great pride in his trading business.  An old friend

remembers how "[h]e told us about his involvement and pride in setting up the computer system

for the trading business, but never really spoke about Bernie's end of the business."   In that

respect, Peter had much to be proud of.  A retired Vice Chairman of the Board of Directors of A.

G. Edwards, Inc., recalls that A. G. Edwards sent Peter's trading business orders for securities

listed on the New York Stock Exchange because "[t]hey were recognized for superior service,

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **30** of **43**

faster executions and better pricing for investors' orders. Peter's firm always put the investors'

interests first, often at the expense of the firm's. When the inevitable error would occur Peter's

firm's approach was never 'what will this cost' but 'what needs to be done to ensure the investor

is treated fairly.'" Similarly, the former CEO of Bear Stearns Securities Corp. writes that he

used BLMIS for stock execution services and client transactions, and "business dealings were

always fair, above board, and respectful."

Among Peter's greatest accomplishments were his technological innovations.

Alberto Casanova, who worked with Peter in developing his market-making trading system over

the years, recalls that Peter had a vision for the future; together, they developed one of the few

trading systems at the time that would execute a customer order automatically based on the best

price available from the Consolidated Quote Association. The trading system proved to be a

success and allowed Peter's business to compete not only with other market makers but also

against the New York Stock Exchange.

Beginning in 1998, Mr. Casanova also worked with Peter to develop the PRIMEX

Auction System, in which Goldman Sachs, Merrill Lynch, Morgan Stanley, and Citigroup were

partners, and which was subsequently licensed to the NASDAQ Stock Market. Mr. Casanova

recalls:

> Throughout the times that I have known Peter, he has always
> shown a strong sense of the need in the over the counter
> community to try and improve the price an investor would receive
> in a transaction. In that regard, Peter pioneered change in the

LANKLER SIFFERT & WOHL LLP

> industry by including a price improvement capability within his trading system so that the customer orders that his firm received had an opportunity to receive a better price. This concept of price improvement was the cornerstone of the PRIMEX Auction System.

Beyond his accomplishments in the market-making business, Peter also cherished working with his daughter and with his nephews, Mark and Andy – his boys – who also worked with him in the market-making business. He loved what he did and loved that he saw his family everyday.

Peter's energy, passion for innovation, and high standards of performance positively impacted not just his own firm, but the entire securities industry. James M. Anderson, who served as outside counsel to the Cincinnati Stock Exchange (CSE), recalls that as a CSE board member, Peter was "the best-informed, most thoughtful visionary on the board of an organization that was committed to innovation in trading mechanisms in an industry that was resistant to change." The CSE offered a radically different alternative to trading than that offered by the New York Stock Exchange ("NYSE"), and Peter was an enthusiastic supporter of this innovation: "On many occasions at board meetings and in conversation he argued – persuasively – that in order to be an effective competitor the CSE needed to operate at the highest level of integrity, effectiveness and compliance." Mr. Anderson also recalls that discussions at board meetings "were always measurably enriched by Peter's contributions," and that his departure left Mr. Anderson with sadness and regret that the CSE would not continue to have the benefit of Peter's thinking.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **32** of **43**

Peter also served with Ronald Kessler on various industry committees and task forces with the purpose of promoting the safety and soundness of capital markets, ensuring the integrity of the industry, and maintaining investor confidence in the financial industry. Mr. Kessler recalls that "Peter excelled at these meetings. His knowledge and integrity were unquestioned. His coun[sel] was sought by regulators as well as competitors. He always gave his time and input to improve the industry and investor experience." Indeed, Peter's "insights and leadership helped guide our industry through a period of uncertainty and explosive growth, without which, market confusion and inefficiencies leading to the erosion of investor confidence would have resulted." Leonard Mayer, who was a market-making competitor, later a colleague of Peter's, and also served on industry boards and committees with Peter, recalls Peter's "relentless demand that the rules and decisions that we promulgated were always in the best interest of the investing public rather than our own profits."

In addition, as a Board member of A. G. Edwards commented, "Peter always challenged management to maintain a client-first framework; he wanted to know how decisions were going to be good for the client. He was also passionate about employee benefits opportunities and equality."

**III.    Community Service and General Kindness**

Throughout his life, Peter has generously contributed to many worthy charities, both financially and more importantly through his personal service, and helped individuals along

Lankler Siffert & Wohl llp

the way in any way he could.  Peter's niece explains that Peter "has always put others first and

taken on the Jewish idea of Tikun Olam – heal the world in a very personal way"; Peter's

commitment to others also has inspired his family to give of themselves, even in the family's

darkest days.

For more than a decade, Peter served on the Board of Directors for the Gurwin

Jewish Nursing & Rehabilitation Center, a nationally recognized facility aiding the elderly and

disabled.  The Executive Vice President/CEO of that institution recalls Peter's warmth and

dedication in serving vulnerable seniors:

> He was an active participant in all we do and provided valuable
> counsel, guidance and support.  I had the opportunity to get to
> know Peter and his family during his years of service.  He was
> truly dedicated to our mission of "caring for those who cared for
> us" and he had a passion for helping those who turned to us for
> care at a time in their lives when they needed help the most.
>
> Each year Gurwin holds a formal graduation ceremony recognizing
> our "seniors" who participate in a one year curriculum of adult
> education.  The program culminates in a formal graduation
> ceremony for our graduates.  Peter attended this event every year
> and showed great warmth and emotion as he helped to make the
> day special for our program participants by presenting their
> diplomas.  It was clear that his involvement meant a great deal to
> him and we were all touched by his devotion and pride.

Peter served as a "selfless and dedicated" member of the board of the Old

Westbury Hebrew Congregation.  A fellow board member describes Peter as "a man of deep

commitment and sensitivity," and notes that during a "period of severe economic hardship for

the congregation he volunteered to serve . . . on a Financial Advisory Committee," where his

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **34** of **43**

"knowledge and sage counsel helped [the congregation] to weather this crisis." Another congregant recalls that when the Old Westbury synagogue embarked on a major renovation, "Peter immersed himself in the project itself, helping to design parts of the sanctuary with a zeal and commitment beyond expectation. He met with architects, construction staff, and sub-contractors. Peter demonstrated his desire to make certain that everything was done correctly, with respect, and in keeping with the religious laws and customs." Another congregant recalls that Peter was soft-spoken, but his ideas were always clear and made sense: "He was a man we could rely on to lead and to work. This is a religious man who is deeply involved in all aspects of Temple life. Our congregation has been very fortunate to have Peter Madoff and his family as members."

In addition, Rabbi Rubinstein of Central Synagogue in Manhattan notes that Peter has been "a trusted participant in every program we have offered to demonstrate social justice on a personal level. He has worked seriously in support of our 'mitzvah' programs which offer hands-on support of children and adults who are in need," and Peter consistently "stands ready to help with his time, energy, and deeds, even more than with words upon which others more typically rely as a substitute for showing up."

For a decade, Peter served on the board of the Lower East Side Tenement Museum, participated in all the Museum's events, and offered a "steady hand through the most challenging of times," according to the founding president of the Tenement Museum. She recalls that when Peter joined the board, "it was a decrepit tenement property in a drug and crime

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **35** of **43**

infested area of New York City.  There was no glory to be gained by sitting on its board, no array

of distinguished New Yorkers with whom to rub shoulders; no board travel to exotic places.

Indeed, the only thing that a prospective board member could be assured of was headaches."  But

Peter signed on and faithfully worked to build the museum – now the most visited historic site in

New York City – because he liked the Museum's mission:  "To promote tolerance and historical

perspective."

   In recent years, Peter has devotedly participated in the Central Synagogue

Breakfast Program, preparing and serving meals to the hungry at least one morning a week.

One of Peter's co-volunteers who has worked with the program for over 14 years observes that

he has shown an unusual degree of "consistency of service, kindness, caring, and genuine

concern" for the guests:

> Mr. Madoff keeps an eye on those he knows (we have many repeat
> guests) who often want seconds to make sure their particular needs
> are met, especially when a guest may be unable to assert his own
> needs appropriately.  He is quick to notice any hand raised either
> for more food, bread and butter or a coffee refill.  His gentle, soft-
> spoken manner with guests, often helping to calm someone who is
> agitated, and the fact that Peter is there when volunteer colleagues
> need help before the request is expressed has endeared him to us
> all.

   Another volunteer describes Peter as a "reliable, hardworking and compassionate

volunteer," and notes Peter is "willing to perform any task needed to aid our program": "He has

always been kind and respectful to our guests and the other volunteers.  He is the last to leave

and is extremely diligent, almost to the point of being annoying, to make sure that no left over

Lankler Siffert & Wohl llp

Honorable Laura Taylor Swain
December 6, 2012
Page **36** of **43**

food is wasted and is packaged and distributed to our late coming guests." Rabbi Peter

Rubinstein has observed Peter's "uncanny awareness of other people's suffering" and his "desire

to improve their lot," and notes that Peter has demonstrated a willingness "to provide an ear for

those who need to tell their own story."

In addition to his work with these programs, for the last year and a half, as part of

a Synagogue program, Peter has been spending an hour or so each week teaching English as a

second language to a young Chilean woman striving to develop a career as a real estate broker.

Peter's kindness and generosity are apparent in the many little things he has done

for people on a daily basis. A former neighbor recalls that when he ordered food to be delivered

to his apartment, he would often order extra for the doormen and send down sodas to go with the

food.

Peter also exhibited his natural generosity and caring with BLMIS employees.

Mr. Casanova recalls that when Liz Weintraub, the BLMIS head of Information Technology,

developed lung cancer, Peter insisted that she reduce her workload. In her final weeks, he

arranged for her and her family to spend a week in Disney World so that she and her family

could share some last moments of joy, and her family would have fond memories after her

passing. His secretary Elaine recalls that he insisted she leave work to care for a friend whose

husband was dying, and upon her return the following day, Peter was only concerned that

Elaine's friend was alright. When Henry Cohen, the father of friends of Peter's, became ill while

L A N K L E R   S I F F E R T   &   W O H L   LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **37** of **43**

in Florida, Peter sent a car for him and had him flown home to New York for treatment; Henry's

family credits Henry's recovery to Peter's generosity and caring.

Naomi Jacobson writes of Peter's "extraordinary kindness and caring" towards

her husband Frank during his last year of life:

> Peter and Frank worshipped together for many years and formed a
> strong Saturday morning bond.  When it became clear that my
> husband Frank was too sick to attend services and go to lunch
> after, Peter took it upon himself to try and remedy the situation for
> his friend.  Each Saturday after services, Peter would show up to
> my house to sit with Frank in the den and tell him about what had
> transpired, talk about the sermon and then just talk.  Those visits
> lasted the whole afternoon.  They were a lifeline for my husband.  I
> would go out and come home a few hours later and see Peter still
> there with Frank.  Sometimes they were talking or watching TV;
> eating or both just snoozing.  Peter clearly had his own troubles at
> that time.  But no matter, he set all aside to be with Frank and to
> help where he could.  My husband loved these Saturdays with
> Peter.  I will forever thank Peter for this.

Even as he has struggled with the collapse of his career and life in the last few

years, Peter continues to do what he can to help others.  The landscaper at his Old Westbury

home recalls that when Peter could no longer employ him, Peter took it upon himself to try to

find other customers for the landscaper:  "At that time he was struggling with his major life

change but he still was looking out for my needs.  That is the type of person Peter is, he is always

there for you even when his own life is falling apart."

As Roger Fisher succinctly states, "Peter does the right thing when no one is

looking."

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **38** of **43**

## IV.    Religion

Peter has always been a religious man.  It was important to him that he and

Marion keep a Kosher home, and over the years, Peter delighted in sharing religious holidays

with extended family.  With patience and without judgment, Peter gently educated those who

were less devout and encouraged them in their pursuit of learning about Judaism.  For example,

the ex-wife of Peter's nephew Mark Madoff fondly recalls spending religious holidays with Peter

and the education and support that Peter provided in her own religious evolution:

> He was patient with my younger self who was not as reverent as he
> was and often took the time to explain rituals, history and its
> significance to our lives today. . . .  When my son became a bar
> mitzvah in 2005 (and later my daughter in 2008) Peter was
> particularly proud.  I knew that there were few people in the
> synagogue that day who understood the importance of the event, or
> the evolution of my belief in what we were doing.

During Roger's illness and after his death, Peter immersed himself in religion,

finding some solace in Judaism.  His secretary Elaine Solomon recalls:

> Every week for many years he attended a Torah meeting before the
> market opened.  The rabbi and several of Peter's friends would
> meet in one of the offices and discuss Torah.  For as long as I have
> had the pleasure of knowing Peter he has always been religious.
> When he would be out of town over a weekend, whether on
> business or vacation, he would attend Saturday services at the local
> synagogue.  I understand that being religious is not always
> synonymous with being a good person but in Peter's case it most
> certainly is.

Rabbi Michael Stanger of the Old Westbury Hebrew Congregation notes that

LANKLER SIFFERT & WOHL LLP

"throughout the years, Peter has been a regular fixture at our services, not just on High Holy Days, but on Shabbat mornings, and often weekday mornings as well, often entering the room as the tenth man and enabling us [to] complete the necessary quorum and recite certain prayers as a result."

In recent years, in grappling with his own mistakes and what has become of his life, Peter has participated in a Talmud class in his synagogue, in which he explores "law, charity, family and societal responsibilities, reward and punishment, free will, living a religious life through focus on good deeds vs. study, the role of the individual – the broad range of matters that thoughtful people rarely have the time to explore deeply."  A fellow participant in the class, observes that "Peter participated fully, displaying, as I thought, a moral and caring point of view about the individual and society, reward and punishment, repentance and forgiveness. . . .  I can only say that I have seen a good man who, if he has done questionable things, is truly trying to repent, and to act in accord with the best traditions of Judaism and humanity."

Peter's commitment to come to terms with and repent for his wrongdoing has been obvious to Rabbi Rubinstein as well:

> As much as Peter is poignantly aware of life-cycle events he might miss as a result of his sentence, he faces these possibilities with as much equanimity as is possible and remains committed to his own need for atonement.  Peter yearns to understand what led him to do wrong and seeks inner peace.  He is committed to assessing and analyzing the events, impulses, and family factors which shaped him including his inability to uphold his legal responsibilities as an officer of a company.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **40** of **43**

## V.   Punishment

Peter's suffering since December 2008 has been cataclysmic.  When Peter's
brother Bernie revealed his fraud to Peter in December 2008, Peter's world was shattered.  The
legitimate market-making business to which he had devoted his entire working life was
effectively destroyed, and on July 26, 2012, he consented to be formally barred from the
securities industry by order of the Securities and Exchange Commission.  Moreover, Peter
almost certainly will never again be able to find employment *in any field*, nor to offer any
financial support to his family.  Indeed, since December 2008, Peter even has been turned away
from volunteer opportunities on the basis of his name.

This suffering is exponentially exacerbated by the fact that as part of his plea,
Peter agreed to forfeit essentially all his existing and future assets and income by virtue of a $143
billion forfeiture judgment, effectively rendering him totally dependent on others just to survive
for his remaining days.  In addition, the vast majority of his wife's assets also are subject to
forfeiture, and she will live out her remaining years under enormous financial stress.  The
punishment that Peter Madoff has suffered as a result of the massive forfeiture and his inability
to ever find employment again is extraordinary.

Peter's financial suffering, however, is dwarfed by the emotional pain and
humiliation he has suffered as a result of the Madoff scandal.  Peter's sterling reputation –
established through decades of dedication, hard work, and high standards of professionalism and

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **41** of **43**

integrity in the market-making community, as well as charitable works – was destroyed; he was

vilified in the press; he received threats; and he lost friends.  Peter's suffering in this respect is

extraordinary.

Most devastatingly, Peter has suffered the punishment of watching the family he

so adored torn apart as a result of his brother's fraud.  He and his family have suffered the

enormous betrayal of his brother, whom he idolized; he has watched family members – including

his 78-year-old sister – lose their life savings; he has suffered the fear and stress of this

investigation and prosecution (as well as many lawsuits filed against him by the Trustee and

various investors); and most excruciatingly, he has suffered the loss of his precious nephew

Mark.  Although Peter has been under the care of a psychologist since 2003 (when Roger was

ill), his emotional condition predictably has deteriorated further as a result of this case, and he

recently was placed on anti-depressants.

It is difficult to imagine a defendant suffering more severe punishment than Peter

Madoff has suffered pre-sentencing.

In short, Peter Madoff is a good man who made serious mistakes.  His humanity

does not excuse the offenses for which he stands convicted but it does place that conduct in the

proper perspective of a man who, in many respects, has lived an exemplary life.

In terms of punishment there can be little question that Peter Madoff already has

been crushed by his brother's fraud and the investigation and prosecution of this case.  He has

LANKLER SIFFERT & WOHL LLP

been effectively and formally banned from a profession that he loved and excelled at for his

entire working life.  He has endured enormous shame and humiliation as a result of his brother's

infamous Ponzi scheme as well as his own now public misconduct.  He has been unable to find

meaningful work since his brother's firm imploded and there is little chance that that situation

will change when he emerges from serving a prison sentence.  Moreover, under the forfeiture

agreement, he would not be able to retain one penny of any income he could earn.  In addition to

everything else the financial consequences arising from his forfeiture agreement are punitive in

the extreme.

        In sum, as a result of serious admitted misconduct, a good man – who has spent

much of his life taking care of and looking out for others – has suffered the ruination of his

professional, emotional and financial life.  Regardless of his sentence, there is no plausible

chance that Peter will commit further crimes.  He is a 67-year-old broken man whose life was

shattered by his brother's scheme as well as by his own misconduct (and this investigation and

prosecution), who will never work in the securities industry – or any other industry – ever again,

and will never again have any income or assets.  The only question is whether Peter will die in

prison or share a few more years living with his cherished family.

        We would request that Mr. Madoff be permitted to surrender directly to the

designated prison institution (we understand that the U.S. Attorney's office has no objection to

this request), and that the Court recommend to the Bureau of Prisons that he serve his sentence in

the Otisville prison camp which will permit his devoted family reasonable ability to visit him.

LANKLER SIFFERT & WOHL LLP

Honorable Laura Taylor Swain
December 6, 2012
Page **43** of **43**

For someone of Mr. Madoff's religious principles and practices, we understand that Otisville

offers the opportunity for him to comply with religious dietary rules – kosher food is available –

and also religious services for those of the Jewish faith.  In addition, we would request that Peter

Madoff be permitted to attend his granddaughter's Bat Mitzvah on January 19, 2013, and

surrender at any time after that date.

       We thank you for your consideration of this letter and of the many other letters

submitted on behalf of Peter Madoff.

       Respectfully submitted,

       John R. Wing

JRW:mat

cc:  US Probation Officer Christopher Ferrall
     AUSA Lisa Baroni
     AUSA Matthew Schwartz
     AUSA Julian Moore